W. L. FINCH *v.* ALMA GIBSON.

(*Jackson.* April Term, 1918.)

1. SEDUCTION. Willingness of female.

The question in seduction cases is whether the female's willingness is induced by some act, representation, or statement, in the absence of which there would be no willingness, in which case there is seduction, or whether such willingness arises out of sexual desire or curiosity, so that the female only seeks opportunity for commission of the act. (*Post, pp.* 142, 143.)

Cases cited and approved: Reed v. Williams, 37 Tenn., 580; Love v. Masoner, 65 Tenn., 26; Franklin v. McCorkle, 84 Tenn., 609.

Case cited and distinguished: Bradshaw v. Jones, 103 Tenn., 331.

2. SEDUCTION. Representations. "Artifice." "Deception."

The representation of the man that pregnancy will not result from natural sexual intercourse will not constitute artifice, deception, or promises, since such representation is contrary to the well known natural result of such act. (*Post, pp.* 143-145.)

Case cited and distinguished: People v. Smith, 132 Mich., 58.

3. SEDUCTION. Conditional promise of marriage.

A general rule that promise of marriage conditioned upon pregnancy resulting from intercourse will not amount to seduction is inapplicable, where there are other influences amounting to deception, artifice, or promises inducing the female to surrender. (*Post, pp.* 145, 146.)

4. SEDUCTION. Question for jury.

Where there are influences other than a conditional marriage promise inducing the woman's surrender, it is a question for the jury whether such surrender was out of sexual desire or curiosity, or induced by the man's acts, representations, or statements. (*Post. p.* 146.)

Finch v. Gibson.

5. **SEDUCTION. Elements. Chastity.**

Chastity of the female before and at the time of the alleged seduction is a material element of the offense. (*Post, pp.* 146- 148

6. **SEDUCTION. Admission of evidence.**

Where in a seduction case defendant's evidence showed continuous relations between plaintiff and another man, extending before and after the alleged seduction and the only question was the nature of such relation, evidence of her conversation and familiarities with a perfect stranger during such period of time was admissible; such evidence being competent both to corroborate testimony of the witness who claimed to have had such relations with plaintiff and to explain correspondence between them, and having a direct and open relation to the issue of plaintiff's chastity at the time of the alleged seduction. The fact that such conduct occurred subsequent to the alleged seduction goes to its weight rather than to its admissibility. (*Post, pp.* 148, 149.)

Cases cited and approved: State v. Holter, 32 S. D., 43; State v. Brown, 86 Iowa, 121; State v. Baldoser, 88 Iowa, 55; Stinehouse v. State, 47 Ind., 17.

---

### FROM HENDERSON.

---

Appeal from the Circuit Court of Henderson County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court. —Hon. N. R. Barkam, Judge.

T. A. Lancaster and W. H. Lancaster, for plaintiff.

W. F. Appleby, Jno. F. Hall and L. B. Johnson, for defendants.

MR. JUSTICE LANSDEN delivered the opinion of the Court.

The suit was brought by Miss Gibson to recover damages of defendant below for her alleged seduction. Plaintiff below states that her seduction was accomplished by defendant in December, 1914, and the relations between them established at that time continued until about July, 1915. Defendant denies that he had any illicit relations with plaintiff at any time, and offered proof to show that plaintiff was not a chaste woman at the time of her alleged seduction. This latter proof included evidence of her illicit relations with other men before the time of the alleged seduction by defendant, and which continued at intervals until about July, 1915. Defendant offered the testimony of one Sanders, which tended to show the immoral character of plaintiff after the alleged seduction, but during the period covered by her alleged relations with witness Tucker. This evidence was held incompetent by the trial judge.

There were verdict and judgment for plaintiff in the sum of $750, which, upon appeal, was affirmed by the court of civil appeals. The case is before us upon petition for *certiorari*.

Plaintiff was night operator for the telephone company at Lexington at the time, and was until about July 1st, when she returned to her father's home at Parsons.

Miss Gibson's statement of the commencement of her relations with defendant is thus told by her:

"Well, he called in one night a short while after I began to work, and he called in and asked for a number, and he asked who I was, and I asked for the number again, and the other operator asked who it was, and I wasn't acquainted there, and she told me it was Mr. Finch, and he was all right and to go ahead and talk to him, and in about a week I went home, and he was on the train as conductor, and there was a little girl sitting by me, and he kept picking at her on the way down, and then we came back on the same train, and after I got back that night he called in and I asked his number, and he said he knew who I was, and I asked who he was, and he told me, and he asked me if I liked Lexington, and asked if I had found a fellow, and I told him 'No' I hadn't been here quite long enough to find a fellow, and he asked how he would suit, and I told him I did not know, but if I could meet him I reckon it would be all right. I didn't have any other fellow, and he called me along every night or two, talking about the same conversation, asking about the work, and he wanted to meet me and come up there, and I told him it was against the rules, and I didn't keep company in the office, and he said that I had to sleep in the daytime, and he wanted to come up and meet me, and I never would give up to him. They run on until December, and he called one night and said we had been talking a long time, and that he

wanted to come up; that he didn't mean any harm, and it was thirty or forty minutes before I give up, and he said he just wanted to meet me and couldn't see me in the daytime, and I finally gave in for him, and he come just before 9 o'clock; and he came in and sit down and pulled off his hat and rubbed his hand over his head and said, 'How did I think I would like a bald-headed man like him,' and I said for the acquaintance I had I liked him all right, and he taken some chewing gum and kept on asking me about the work, and if I still liked it, and if I had found any other fellow, and I told him no, and he taken hold of my hand and started to kiss me, and I told him turn me loose or I would knock him down, and he said he didn't mean any harm, he just wanted to have some fun, and he said other girls do, and I said, I don't care, I didn't, and he pulled me over and said he wouldn't mistreat me, and that he loved me; and that there wouldn't nothing happen, and if it did I would be taken care of; that he would see I was taken care of, and not thrown aside, and he kept on pleading, and I told him to turn me loose, and he told me to trust him and to look to him for protection and he would see I was taken care of, and he taken me and threw me across the table, and I yielded to him, but I didn't willingly consent, and then I commenced to cry, and he said he wasn't going to hurt me, and that nobody would know it, and he kept making his promises and pleading with me, and stayed on for thirty or forty minutes after,

and after I got reconciled he left and went home, and called me up every two or three nights, and he come every now and then, and I never did give my consent; he just promised that he would see that I was not thrown aside, and he would protect me, and I trusted him and was looking to him for protection if anything happened, and after I found out my condition the last of June, I told him my condition, and he got mad and said I needn't be trying to pull the wool over his eyes and he wasn't going to marry me now, and I told him, after he promised me that, he had to do what he said he would, and then he went home and called me up and said he was sorry he talked like he did and wanted me to forgive him, and I said he had to stick to his promises. I didn't hear any more for a while, and he called in and asked how I was getting along, and would meet him on the street, and he would speak; and I quit work the last of July and went to my sister's, and the middle of August I was in town and met him on the street, and he asked me how I was getting along, and said, ·'You are getting to be a little country girl,' and I said, 'Yes,' and I never heard any more from him until October, and Miss Crowder, Nell Crowder, was at the depot, and he sent me word by her to meet him at the depot, and the next morning when the train pulled up to get water, we went on one side of the train, and he came out the door and helped us across on the other side, and Miss Hays went to get her ticket, and him and I walked up the track to-

gether, and he asked me, he said he seen we were having a tent meeting going on, and asked if we were all getting good; and he asked if I got the work, and I said yes, and he said he would see us again in a few minutes, and he came back and asked if I was coming to the fair, and told me to be sure and be there, and we would all put on a show, and about that time the train pulled out, and that's the last I heard of him until I heard he was gone.''

On cross-examination she said that she gave defendant permission to come to see her in her bedroom after he had insisted for thirty or forty minutes. She admitted that she had no previous personal acquaintance with defendant; that he had never called upon her, and they had never been introduced, or had any conversation with each other except over the telephone. She says that he accomplished her seduction in twenty-five or thirty minutes after he entered the room; that there was a folding bed in the telephone office, where she worked, between the keyboard and the wall, but she had not made it down when defendant came, and did not make it down for the occasion because she did not have time. She was then asked the following questions:

''And what he said to you was substantially this —as I gather—that other girls were doing that way, and if you would yield he would see you wasn't cast aside and thrown away in the event anything happened? A. Yes, sir. Q. You understood him to mean if you yielded and anything happened, if

you got pregnant, he wouldn't cast you off? A. No; not that night; he said there wouldn't be any danger. Q. Danger of what? A. I don't know what he meant. Q. What did you understand him to mean? A. I understood it to be he would see I didn't get in a family way. Q. And he said if you did get in a family way he would see you were taken care of and not thrown aside? A. Yes, sir. Q. That's all he did say before you yielded? A. No, sir; he kept on them promises and telling me he loved me. Q. Mighty short acquaintance to be in love. A. I had been talking to him over the phone. Q. You got in love with him over the phone? A. He just overpowered me some way, caused me to think so much of him. Q. The first time you saw him you fell in love with him? A. (No answer.)''

The definition of seduction made by this court has appeared to be understood at different times not to mean exactly the same thing. In *Reed* v. *Williams*, 5 Sneed, 580 73 Am. Dec., 157, it was said that "it is enough that by any means whether by deception or importunity, the seduction is accomplished." This case further held that in an action by the father for the seduction of his daughter it could not be shown in defense by cross-examination of the daughter that she had been guilty of acts of unchastity with others. The case was expressly overruled upon this point in *Love* v. *Masoner*, 6 Bax., 26, 32 Am. Rep., 522, and we may add that in other respects it was shaken as authority by that opinion. So in the later case of

*Franklin* v. *McCorkle,* 16 Lea, 609, 1 S. W., 250, 57
Am. Rep., 244, the court said that seduction is the
act of overcoming the chastity of a female by artifice,
flattery, or promises.

In *Bradshaw* v. *Jones,* 103 Tenn., 331, 52 S. W.,
1072, 76 Am. St. Rep., 655, the cases were all reviewed,
and the definition of seduction was given in the
following language:

"Does the willingness arise out of the sexual de-
sire or curiosity of the female, so that she only needs
opportunity for the commission of the act, or is that
willingness induced by some act, representation, or
statement of the man, in the absence of which there
would be no willingness upon the part of the woman?
In the latter case there is seduction; in the former
there is not."

The foregoing is the last definition of the offense
given by this court, and we think it is a correct one,
and should be applied to the facts of this case.

The facts of that case were unusual in that a
married man seduced a single woman, but the court
stressed the relationship of the defendant with the
plaintiff, and especially the fact that he spoke almost
as one having authority over her, she being a mem-
ber of his household; and, while the court does men-
tion his representation to her that he was impotent,
and states that she may have entertained such a
belief, and that her "fears" were lulled and quieted,
still a reading of the entire case shows that the deci-
sion was not placed upon the ground that she yielded

her virtue because her fears of the results to follow were lulled by defendant's representations. It was shown that she never did consent to the connection, and in a short time afterwards, related to defendant's wife all that had occurred, thus indicating that her mind had never accepted the relations between herself and defendant.

At the threshold of this case, the question is presented for our determination of whether a female who surrenders her virtue upon the representation by the male that he will shield her from the consequences of the act has been seduced as a matter of law? It is difficult to see how any representation which a man could make upon this subject would deceive or mislead a virtuous woman into submitting to his desires. Every one knows that the natural result of such an act is to beget a state of pregnancy upon the body of the female, and the representation of the man to the effect that pregnancy will not result from a natural connection of the sexes would be a claim upon his part which every one must know he cannot fulfill; and if she claims that it overcomes her will, and is the inducing cause for her having illegal connection with him, it must be deemed to be a pretext for the indulgence of her sexual desires rather than artifice, deception, or promises within the meaning of the law.

In the District of Columbia the common law does not prevail upon this subject, and the Congress

passed a statute applicable to the District which provides:

"If any person shall seduce and carnally know any female of previous chaste character, between the ages of sixteen and twenty-one years, out of wedlock, such a seduction and carnal knowledge shall be deemed a misdemeanor." Act Cong. March 3, 1901, chapter 854, 31 Stat. 1332.

The case of *Hamilton* v. *United States* came before the court of appeals of the district upon the question of whether a promise of marriage "if anything happened" in order to secure sextual intercourse with a female of previous chaste character was seduction. The court held that it was not, saying:

"We are unable to distinguish between a bargain of this sort and one where a virgin deliberately parts with her virtue for money consideration. The parties were practically of equal age, both of the age of discretion, and it does not appear that they were lovers. Defendant was only a casual visitor to the house where the prosecuting witness resided. There is no evidence of his having practiced any art or wile, deception or persuasion, to induce the prosecuting witness to yield to his desires. Hence none of the elements enter into the transaction upon which the crime of seduction may be predicated. Where, as in this instance, a woman traffics away her chastity for no other consideration than a mere contingent promise of marriage procured by her solicitation as an in-

demnity against possible pregnancy, it is not seduction under any statute, or rule of law with which we are familiar." *Hamilton* v. *United States,* 51 L. R. A. (N. S.), 809.

In *People* v. *Smith,* 132 Mich., 58, 92 N. W., 776, the following language occurred:

" 'Is a promise to marry, conditioned upon illicit intercourse resulting in pregnancy, calculated to induce a pure woman to yield her chastity? In our judgment, this question admits of but one answer. Such a promise has no tendency to overcoming the natural sentiment of virtue and purity. The woman who yields upon such a promise is in no better position than as though no promise whatever had been made. No wrong is done her if she is put in the class with those who commit the act to gratify their desire. She was willing to lose her virtue if some provision was made to conceal its loss. If pregnancy does not result from illicit intercourse, her conduct is, in every respect, as culpable as that of her companion. If pregnancy does result, his conduct becomes more culpable than hers only when, and not until, he refuses to marry her. The commission of the offense cannot depend upon the happening of a subsequent event.' "

The annotator's note to *Hamilton* v. *United States,* supra, states that where a promise of marriage is an essential element of seduction, the rule is almost universal that a promise of marriage conditioned upon pregnancy resulting from the intercourse will not amount to seduction, and cites many cases in support.

The cases to which we have had access are in harmony, and we do not know of anything to the contrary in this State.

What we have said is where the conditional promise of marriage is the sole inducing cause to the plaintiff's surrender of her chastity. Of course where there are other influences which amount to deception, artifice, or promises and they are the inducing motive to the plaintiff for surrendering her virtue the rule stated would not apply. In such an event it is a question for the jury to say if the plaintiff surrendered her virtue out of her sextual desire or curiosity, or whether her willingness to indulge in the intercourse was induced by such acts, representations, or statements of the man. We do hold, however, that as a matter of law, if the female surrenders her virtue upon a representation of the man which all know is contrary to the laws of nature, such a representation cannot be deemed to be the inducing cause for her willingness to indulge in the act, and her indulgence will be ascribed to sexual desire, or curiosity, or previous sexual experience, rather than to artifice, deception or promises.

It should be borne in mind that the chastity of the female before and at the time of the alleged seduction, is a material element of the offense. *Love* v. *Masoner,* supra; *Bradshaw* v. *Jones,* supra; *Franklin* v. *McCorkle.*

Plaintiff states that her relations with defendant extended from December, 1914, to about July, 1915.

She also claimed that she had never previously had sexual intercourse with any other man. The defendant denied that he had ever had sexual intercourse with plaintiff, and averred in addition that plaintiff was an unchaste woman prior to and at the time she alleges that defendant seduced her. He offered the testimony of witness Tucker to support this contention. Tucker states that he had had sexual connection with plaintiff prior to the time of the alleged seduction and often afterwards. He introduced certain letters which he claimed corroborated his statement. Miss Gibson said that she had had no such relation with Tucker, and that the letters, when properly understood, do not bear any such interpretation. However, she does admit the authorship of the letters, and they show that during the time she says that defendant was calling on her two or three times a week and indulging a sexual intercourse with her, she was writing to Tucker in the most endearing terms, professing the most boundless love for him, and in one letter, written after her claimed relationship with defendant, she invited him to meet her at a designated place, saying that they could ''arrange it,'' and she would try to show him a good time. Letters passed between them after this one. All of hers were written in terms of the greatest endearment. The defendant offered to prove by one Sellers that he approached plaintiff upon the subject of sexual indulgence the first time he ever saw her, and without any previous introduction. He would have stated

that she readily agreed to his proposition and permitted him to take unwomanly liberties with her. This was in June or July after plaintiff became pregnant, and while she was still corresponding with Tucker, and, as she says, maintaining her relationship with defendant. This evidence was excluded by the trial judge, and the court of appeals affirmed his action.

We think this was error. It is highly improbable that a woman who would have the conversation and submit to the familiarities of a perfect stranger as claimed by Sellers in June or July was a pure and virtuous person in December, especially when the correspondence with Tucker, both previous and subsequent to December, is taken into view. The evidence was competent both for the purpose of corroborating Tuckers testimony and of explaining the correspondence. The fact that the act testified to by Sellers was subsequent to the alleged seduction goes to its weight rather than its admissibility. It had a direct and open relation to the issue of plaintiff's chastity at the time of the alleged seduction. This is true because all of the evidence shows that plaintiff's relations with Tucker were continuous up to the time fixed by Sellers. The only question was the nature of her relations with him. This would doubtless not be true if there had been only one act claimed, either between her and defendant or between her and Tucker. The following cases so hold: *State* v. *Holter,* 32 S. D., 43, 142 N. W., 657, 46 L. R. A. (N. S.),

376, Ann.Cas., 1916A, 193; *State* v. *Brown*, 86 Iowa, 121, 53 N. W., 92; *State* v. *Baldoser*, 88 Iowa, 55, 55 N. W., 97; *Stinehouse* v. *State*, 47 Ind., 17.

For the errors indicated, the case will be reversed and remanded for a new trial.